**JWK INTERNATIONAL CORPORATION,**
Plaintiff,

v.

The **UNITED STATES,** Defendant,

and

**LTM, Inc.,** Defendant–Intervenor.

No. 01–26C.

United States Court of Federal Claims.

May 10, 2001.

Cyrus E. Phillips, IV, Washington, DC, attorney for plaintiff.

Erin E. Powell, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Mitzi S. Phalen and Russell Spindler, Assistant Counsel, Office of Counsel, Naval Air Warfare Center, of counsel.

Devon E. Hewitt, McLean, VA, attorney for intervenor, LTM Inc. Alex D. Tomaszczuk and Daniel S. Herzfeld, McLean, VA, of counsel. David W. Baldwin, President, LTM Inc., Havelock, NC, of counsel.

## OPINION [1]

MEROW, Senior Judge.

This is a post-award bid protest in which the incumbent contractor, JWK International Corp. ("JWK") challenges the decision of the Department of the Navy to award a contract, for acquisition logistics management integration services, to LTM, Inc. ("LTM"). LTM is an intervenor in this proceeding. The matter is before the Court upon plaintiff's motion for a preliminary injunction, defendant's motion to dismiss Count VI of plaintiff's complaint, defendant's motion for judgment upon the administrative record and

1. This Order was originally filed under seal on April 13, 2001. That Order also directed the parties to identify protected/privileged material subject to the Protective Order. On May 7, 2001, an Order was entered allowing the filing, on behalf of all parties, of Plaintiff's Notice of Additional Proposed Redactions and Motion for Leave to File Out of Time. It is noted that neither counsel for the government nor counsel for the Intervenor in this matter signed Plaintiff's Notice of Additional Proposed Redactions although counsel for the government telephoned chambers on May 4, 2001, and advised the Court that the proposed redactions were to be submitted by plaintiff on behalf of all parties. Intervenor has neither commented upon plaintiff's proposal nor proposed any redactions. Nevertheless, based upon the plaintiff's representation that the parties have conferred and agreed upon the proposed redactions, in conjunction with government counsel's representation that plaintiff was authorized to make that assertion, the Order is being re-filed and made available in the public record of this matter today, May 10, 2001, with the parties' redactions adopted and incorporated herein. The parties have proposed redacting only the names of JWK team members. Upon review of the previously issued Order and the proposed redactions it was noted that the team members were identified in several paragraphs in which no redactions were proposed. On the premise that this was an oversight, the names of the JWK team members have been redacted wherever they appeared in the prior Order. Asterisks within brackets ("[* *]") identify deleted material.

plaintiff's cross-motion for judgment upon the administrative record. The solicitation informed offerors that their proposals would be evaluated upon four factors: (1) Technical; (2) Management; (3) Past Performance; and (4) Cost. In its complaint and to some extent, in the briefs submitted to the Court, plaintiff attacks defendant's award decision on the basis that the agency deviated from the evaluation scheme set forth in the Solicitation and the Source Selection Procedures with regard to its review of the Past Performance factor and failed to conduct meaningful discussions prior to making the award; ultimately accepted a proposal from an allegedly irresponsible offeror which did not meet the Past Performance requirements of the Solicitation; applied an irrational cost realism analysis and failed to conduct meaningful discussions regarding the Cost element of its evaluation of plaintiff's proposal; evaluated the Technical and Management elements of plaintiff's proposal in an arbitrary and capricious manner; and breached the implied duties of good faith and fair dealing.

For the reasons stated below, it is concluded that plaintiff does not have standing to assert the causes of action described in Count VI of the Complaint and defendant's Motion to Dismiss that element of the Complaint is granted. It is further considered that with regard to the remaining causes of action, the Navy's award decision was not arbitrary, capricious, an abuse of discretion, or contrary to law. Accordingly, defendant's motion for judgment upon the administrative record is granted and plaintiff's cross-motion for judgment upon the administrative record is denied. It is further concluded that plaintiff's Motion for a Preliminary Injunction is rendered moot by the determinations upon the merits and that petition is therefore dismissed.

## BACKGROUND

The procuring agency, the Naval Air Systems Command Headquarters Maintenance Planning and Design Interface Department ("Navy"), is responsible for providing acquisition logistics management integration for all Integrated Logistics Support elements. Administrative Record ("AR") 35. These logistics management services apply to all Weapon Systems and Subsystems procured by the Naval Air Systems Command. *Id.* The Navy determined that it required contractor support because the expertise required in order to ensure consistency in the procurement of logistics support services exceeded the capabilities of in-house government employees. *Id.*

Accordingly, on February 2, 2000, the Navy issued Solicitation number N00421–00–R–0328, which sought the required logistic support services. AR 170. The solicitation contemplated awarding separate contracts at five regional sites located across the United States, identified by the Navy as LOTs. AR 35.

LOTs I, IV and V of the solicitation were issued on an unrestricted basis. AR 64. LOT II was issued as a competitive small business 8(a) business development program set-aside. *Id.* LOT III was issued as a small business set aside. *Id.* Offerors were permitted to submit competitive proposals on more than one LOT, but were advised that only one contract would be awarded under each LOT. AR 63; 292. The Solicitation contemplated an award of a cost-plus-award-fee contract for each LOT for a base year with nine one-year options with performance to begin on December 1, 2000. AR at 63; 66.[2]

The subject of this protest is the contract for LOT III, which contemplated the provision of logistics support services at the Naval Air Depot located in Cherry Point, North Carolina. AR 63.

### A. Evaluation Factors Considered for Award

Section M.1 of the Solicitation set forth the four factors to be considered by the government in evaluating offer proposals for an award. AR 271. These factors were: Technical, Management, Past Performance and Cost. *Id.* The Solicitation stated that the Technical factor was more important than

---

2. Counsel for the parties advised the Court at the proceeding conducted on April 4, 2001, that the Navy had voluntarily stayed performance of the awarded contract until April 15, 2001.

the Management factor which was more important than the Past Performance factor, which was more important than the Cost factor. AR 289. The evaluation of the Technical and Management factors would each include a "proposal risk assessment" which would "identify the risks associated with an Offeror's proposed approach to accomplish the requirements of the solicitation." *Id.* The Solicitation also stated that the "Technical and Management proposal risk assessments are equal in importance to the Technical and Management qualitative ratings." *Id.* Nevertheless, "[Solicitation] evaluation factors other than Cost, when combined, are significantly more important than Cost." AR 289.

Section M.1(A) stated that an award would be made "to the Offeror whose proposal, conforming to the solicitation, offers the greatest value to the Government, cost and other factors considered, rather than to the proposal offering the lowest price." AR 288. Specifically, offerors were *"forewarned that a proposal meeting solicitation requirements with the lowest evaluated cost may not be selected if award to a higher evaluated cost offeror is determined to be most advantageous to the government."* AR 292 (emphasis in original).

Section M.1(A) also indicated that the government reserved the right to judge which proposal offered the greatest value to the government, and might award a contract "on the basis of initial offers received without discussions." AR 289. Accordingly, offerors were advised that their initial offer should "contain the [o]fferor's best terms from a cost or price and technical standpoint." *Id.* Discussions would be conducted only "if considered necessary by the Procuring Contracting Officer and approved by the Source Selection Authority." *Id.*

Further, the Solicitation set out the criteria the Navy would utilize to evaluate each factor. In Section M.1(C)(2) the Solicitation stated that each offeror's Technical proposal would be evaluated upon the responses to five sample tasks set forth in section L of the solicitation. AR 290. Specifically, the responses would be evaluated to determine the extent of the Offeror's understanding of the Government's requirements, taking into consideration staffing, labor mix, efficiency, timeliness, and potential problems as well as proposed solutions. *Id.* The Navy indicated in Section M.1(B) that it would assign the offeror's technical proposal a qualitative rating of Outstanding, Highly Satisfactory, Satisfactory, Marginal or Unsatisfactory. AR 289. "Highly Satisfactory" was described as a finding that the "[p]roposal exceeds requirements in a way that benefits the government or meets requirements and contains enhancing features which benefit the Government. Any weakness is minor." AR 54. "Satisfactory" was described as a determination that the "[p]roposal meets requirements. Any weaknesses are acceptable to the Government." *Id.* "Marginal" was described as "[p]roposal contains weaknesses or minor deficiencies which could have some impact if accepted." *Id.* "Unsatisfactory" was defined as "[p]roposal does not comply substantially with requirements." *Id.* For purposes of this evaluation the solicitation utilized several definitions contained in Section 15.301 of the Federal Acquisition Regulations ("FAR"). A "weakness" was defined as "a flaw in the proposal that increases the risk of unsuccessful contract performance." 48 C.F.R. § 15.301 (2000); AR 52. Under that provision a "significant weakness" in a proposal is defined as "a flaw that appreciably increases the risk of unsuccessful contract performance." FAR 15.301; AR 52. A "deficiency" is described as a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. *Id.* A "strength," although not defined by the FAR, was described for the purposes of this procurement as an "area[ ] in which the proposal exceeds the Government's minimum requirements." *Id.*

Further, the "proposal risk assessment" which would "identify the risks associated with an Offeror's proposed approach to accomplish the requirements of the solicitation" would be assessed a risk rating of High, Medium or Low. AR 289. "High" was defined as a finding that the proposal was "[l]ikely to cause significant serious disrup-

tion of schedule, increase in cost, or degradation of performance even with special emphasis." AR 54. "Medium" was described as a finding that the proposal "[c]an potentially cause some disruption of schedule, increase in cost or degradation of performance. However, special contractor emphasis will probably be able to overcome difficulties." *Id.* "Low" was defined as a determination that the proposal "[h]as little or no potential to cause disruption of schedule, increase in cost, or degradation of performance. Normal contractor effort will probably be able to overcome difficulties." *Id.*

Section M.1(C)(3) stated that each offeror's Management proposal would be evaluated upon three subfactors, identified, "in descending order of importance," as Management Approach, Key Personnel and Small Business Subcontracting Plan.[3] AR 290–91. Section M.1(C)(3)(a) provided that with regard to the Management Approach subfactor, each offeror's management plan would be evaluated based upon a "demonstration of sound business practices" derived from the offeror's submissions upon sections, described in Section L, dealing with the offeror's overall management approach, usage of teaming, personnel and subcontractors, recruitment/retention, quality management, cost savings and electronic capabilities. AR 275–76; 290. Section M.1(C)(3)(a) provided that with regard to the Key Personnel subfactor, each offeror's management plan would be evaluated upon "the extent to which personnel resumes submitted by the [o]fferor meet or exceed the education and experience required by the labor category descriptions on a labor category basis." AR 290. The Navy indicated in Section M.1(B) that it would assign the offeror's Management proposal a qualitative rating of Outstanding, Highly Satisfactory, Satisfactory, Marginal or Unsatisfactory. AR 289.

Section M.1(C)(4) indicated that Past Performance would be evaluated in terms of risk based upon the offeror's "past performance on contracts or subcontracts currently ongoing or completed within the last three years for similar products or services." AR 291. The Navy indicated that it intended to consider "references listed in the proposal, other customers known to the government, CPARS[4] (if available), and others who may have useful and relevant information. AR 291. Each proposal would subsequently be assigned a risk rating of Very Low, Low, Moderate, High, Very High, or Unknown." AR 289. For purposes of this solicitation, a "Low" Past Performance risk was defined as "[b]ased upon the offeror's performance and systemic improvement record, little doubt exists that the offeror will successfully perform the required effort." AR 54.

Finally, Section M.1(C)(5) indicated that with regard to the Cost factor, the "Cost Realism evaluation will result in a determination of the most probable cost to the Government." AR 291. That clause also indicated that Cost would be evaluated based upon consideration of actual salaries being paid for similar work under other contracts, the Independent Government Estimate ("IGE"), Defense Contract Audit Agency ("DCAA") audit information, and evaluation of compensation for professional employees. *Id.* Furthermore, for purposes of evaluating offeror's proposals, the evaluated cost would be "the higher of either (a) the sum of the [o]fferor's proposed total estimated cost and fee or (b) the [g]overnment's determination of the most probable total cost and fee." AR 291–92.

By the filing deadline of April 4, 2000, only two offerors, JWK and LTM, had timely

---

3. The solicitation specifically states that the Small Business Subcontracting Plan subfactor would apply only to large businesses, and therefore was not a considered subfactor in evaluating offers upon LOT III, which was designated as a small business set-aside. AR 63.

4. Although the briefs submitted do not explain the term CPARS, counsel for LTM explained at oral argument that CPARS, Contract Performance Assessment Reports, are a type of computerized form for evaluating contractor performance, which might or might not be submitted to the government by agencies or others with knowledge of contractor performance. JWK noted in its responses to the September 12, 2000 discussion letter, that "CPARS is a government owned and operated system which no contractor may access or load [sic]." AR 2323.

submitted proposals in response to the Solicitation for LOT III. AR 62.

### B. Initial Evaluations

Defendant's Source Selection Evaluation Board ("SSEB") was responsible for the initial evaluation of the offeror's proposals. AR 37–39. The SSEB consisted of four separate teams to evaluate each of the four evaluation factors. *Id.* Each team was comprised of at least three members, including a Team Leader. AR 44. Among the SSEB's responsibilities was that of advising the Source Selection Advisory Council ("SSAC") and the Source Selection Authority ("SSA") during the source selection process. AR 39–40. The SSA for all LOTS was the Assistant Commander for Logistics, Rear Admiral W.B. Massenburg. AR 42. The six members of the SSAC were appointed by the SSA and included "senior military and civilian personnel representing the various competencies of the Naval Air Systems TEAM involved in the procurement." AR 37; 43. Among their responsibilities was that of reviewing the recommendations of the SSEB and making source selection recommendations to the SSA. AR 38.

#### 1. SSEB's Review of LTM's Initial Proposal

##### a. LTM's Technical Proposal

In its initial review of the proposals, the SSEB rated the Technical factor of the LTM proposal as "Marginal" because the proposal "demonstrated a general understanding of the government's requirement, however, it contained weaknesses and a minor deficiency that could impact successful performance if accepted." AR 2115. In particular, the SSEB found that responses to sample Tasks contained errors, lacked sufficient detail and in some cases were deficient in responding to the government's minimum requirements pursuant to the Solicitation. AR 2115. Specifically, the SSEB noted that the responses to Tasks 2 and 4 met the basic requirements without demonstrating overwhelming Strengths or Weaknesses. AR 2115. However, the SSEB noted that the response submitted for Task 1 was a Significant Weakness and that the response to Task 3 was

rated as a Weakness. AR 2116. The reason for this rating upon Task 3 was that LTM had not provided adequate detail for their technical approach, which focused on the development of a web-based management system, but was lacking in detail to support such a system, and didn't provide an adequate response to the Task requirements for identifying and prioritizing specific elements of the response. AR 2116. The LTM team's Technical proposal was ranked as having Medium risk because the SSEB determined that the demonstrated lack of compliance with task requirements, inconsistencies between plans and technical approaches, and a lack of detail in methods and processes could potentially cause some disruption of schedule, increase in cost, or degradation of performance. AR 2117. However, the SSEB noted that special contractor emphasis would probably be able to overcome the difficulties. AR 2117.

##### b. LTM's Management Proposal

The LTM team Management Proposal received an overall assessment of Satisfactory with Medium Risk. AR 2123. The SSEB indicated that the more important of the two subfactors, LTM's Management Approach, was rated as Satisfactory, and the government noted that the offeror's approach to ensure quality and cost were a Strength. *Id.* The SSEB also noted "a few weaknesses," which it considered acceptable. *Id.* Although the weaknesses were not specifically identified, three criticisms were raised, specifically (1) that LTM had bid several overhead personnel as key personnel, which was considered to provide the potential for direct billing of some overhead activities; (2) that LTM's approach to subcontractor management did not sufficiently detail how each subcontractor would be managed; and (3) that LTM's approach to advancing state-of-art of naval aviation logistics lacked discussion on developing, leveraging or transferring initiatives. *Id.* With regard to the less important of the two subfactors, Key Personnel, the SSEB rated LTM's proposal as Marginal because nine of the fifteen resumes submitted met the government's requirements. *Id.* The LTM team's proposal risk was Medium because it could potentially cause some disrup-

tion of schedule, increase in cost, or degradation of performance, due to the quantity of unsatisfactory key personnel resumes submitted. AR 2124. The SSEB commented that based upon the quantity of Unsatisfactory resumes submitted by LTM it was considered likely that the offeror could provide replacement resumes within the time stipulated by the Solicitation. *Id.*

#### c. LTM's Past Performance Proposal

The LTM proposal for Past Performance was assessed to have a Low Risk, based upon the positive comments and feedback from customers. AR 2129. The SSEB noted that the offeror had "demonstrated past performance on requirements of similar type, size and complexity of the procurement under consideration." AR 2127. Further the SSEB determined that two of the LTM team members had demonstrated systemic improvements beneficial to the government. *Id.* The SSEB noted however, that not all the efforts submitted by LTM team members as evidence of systemic improvements were also considered by the SSEB to be such. *Id.* The SSEB further noted that three of the six LTM team members had received awards demonstrating a high level and quality performance. *Id.* LTM was noted not to have received any CPARS, although team members were noted to have received extensive positive CPARS feedback in their ability to minimize costs and maintain performance schedules. AR 2128–29. In addition, questionnaires, solicited by LTM team members pursuant to the Solicitation, reflected positive performance ratings. *Id.* Based upon the offeror's performance, and systemic improvement record, the SSEB determined that there was little doubt that LTM would successfully perform the required effort. AR 2129.

#### d. LTM's Cost Proposal

LTM submitted a proposed cost of $168,972,835.00 which, after the government probable cost realism adjustment, was determined to be adequate for determining cost reasonableness and realism. AR 2130.

Pursuant to the procedures described in Section M of the Solicitation, the government sought DCAA review of the Labor Rates, Escalation Rates and Indirect Rates cited by LTM and their team members. AR 2443–2474. The DCAA verified LTM's Direct Labor rates and did not note any exceptions. AR 2443. With regard to the Direct Labor rates submitted by team members DCAA compared the proposed rates with the current base rates. AR 2446–47; 2455; 2457–59; 2465; 2467.

Based upon the DRI Cost Information Services recommendation of a proposed labor escalation rate of 3.4% for the first five years of contract performance, the DCAA did not take exception with LTM's proposed escalation rate of 3%. AR 2443. DCAA conducted a similar study of the LTM team members' proposed escalation rates and found that those rates ranged between 3.0% and 3.5%. AR 2447; 2454; 2459; 2464; 2467.

DCAA also analyzed the Indirect Labor Rates submitted by LTM and its team members including Overhead, General and Administrative Costs and Subcontractor costs. AR 2443–44; 2448; 2454; 2459–60; 2465; 2468–69. DCAA noted that it took no exception to the Indirect Labor Rates of LTM and one of its team members. AR 2443–44; 2448. DCAA provided a comparison of proposed Indirect Labor Rates and historical rates for two of LTM's team members. AR 2459–60; 2465. And with regard to the proposed Indirect Labor Rates of one LTM team member, the DCAA evaluated and adjusted those rates to a level with which it determined it did not take exception. AR 2468–69.

Based upon these comparisons, the SSEB conducted its cost realism analysis and upwardly adjusted LTM's proposed cost to reflect the changes made in the escalation rates for two team members,[* *] and [* *]; the adjustment based upon the variance in CCI's direct labor rates; and the evaluated cost calculated based upon team member SM & T's Indirect Labor Rates. AR 2648. The government concluded that the probable cost of LTM's proposal, which it called the Government Realized Position, was $169,972,835.00.

Prior to receiving contract proposals the government had developed an Independent Government Estimate ("IGE"), based upon historical data, of the probable cost to the government over ten years for this contract and derived a total cost of $164,206,050.00. AR 2130. By comparing the Government Realized Position with the IGE, SSEB determined that LTM had submitted a cost proposal that was adequate for determining cost reasonableness and realism. AR 2131.

### 2. SSEB's Review of JWK's Initial Proposal

#### a. JWK's Technical Proposal

JWK received a rating of Marginal upon its Technical proposal because the proposal "demonstrated a general understanding of the government's minimum requirement, however, it contained weaknesses and minor deficiencies that could impact successful performance if accepted." AR 2117. The SSEB noted that responses to certain specific Task items lacked sufficient detail and in some cases were deficient in responding to the Government's minimum requirements specified in the Solicitation. AR 2117. Specifically, the SSEB determined that JWK's responses to Tasks 2 and 4 were strengths because JWK had exceeded the government's minimum requirements, but determined that the response to Task 1 was a Significant Weakness because JWK did not adequately respond to the solicitation and failed to adequately demonstrate a clear understanding of the government's requirements. AR 2118. Tasks 3 and 5 were rated as Deficiencies because the provided responses failed to meet the government's minimum requirements. AR 2119–20. The JWK Technical proposal was assessed a Medium risk rating because the lack of compliance with task requirements, inconsistencies between plans and technical approaches and lack of detail in processes and methods were determined to have the potential to cause schedule disruptions and increase cost or cause degradation of performance. AR 2120.

#### b. JWK's Management Proposal

The JWK proposal for the Management factor received an overall rating of Marginal with Medium risk. AR 2122. The Management Approach subfactor received a rating of Unsatisfactory and the SSEB identified seven specific problems, one of which was that the JWK team had proposed senior corporate personnel as program managers, which allowed for the possibility to direct bill for overhead functions. *Id.* In the Key Personnel subfactor, JWK received a rating of Marginal and it was noted that 11 of the 15 resumes submitted met or exceeded the Government's minimum requirements. *Id.* The JWK team's proposal risk was Medium because their management approach was considered to have the potential to impact on the quality and timeliness of the products and services to be delivered under the contract. AR 2123. Moreover, the weaknesses noted in the key personnel resumes submitted were considered to have the potential for disrupting the schedule, increasing cost and degrading performance. *Id.* It was noted however, that JWK could likely provide replacement resumes within the time limits specified under the Solicitation. AR 2122. Furthermore, all management weaknesses could likely be overcome with special contractor emphasis and a focused corrective action plan. AR 2123.

#### c. JWK's Past Performance Proposal

The JWK proposal for Past Performance was assessed to have a Low Risk, based upon the comments and feedback from customers. AR 2126. The SSEB noted that JWK demonstrated past performance requirements of similar type, size and complexity of the procurement under consideration. *Id.* The SSEB noted that although the JWK team had provided evidence of efforts they considered to be systemic improvements, the suggested items were not considered to be systemic improvements that were beneficial to the government. *Id.* Although no CPARS were submitted for JWK, the SSEB did find CPARS for other team members. *Id.* The SSEB also noted that the questionnaires, solicited pursuant to Solicitation requirements, indicated that customers found JWK's work to be excellent. AR 2126. The SSEB further noted that JWK had demonstrated successful key personnel retention on numer-

ous contracts and ultimately determined that based upon the offeror's performance and systemic improvement record, there was "little doubt" that the team would successfully perform the required effort. AR 2127.

### d. JWK's Cost Proposal

JWK submitted a proposed cost of $154,703,560.00 which, after the government adjustment for probable cost, was determined to be adequate for determining cost reasonableness and realism. AR 2130.

Pursuant to the procedures described in Section M of the Solicitation, the government submitted the Labor Rates, Escalation Rates and Indirect Rates cited by JWK and their team members to the DCAA for evaluation. AR 2387–2441. The DCAA verified JWK's Direct Labor rates and noted differences between the proposed direct labor rates and the offeror's most current direct labor rates. AR 2387. With regard to the Direct Labor rates submitted by JWK team members DCAA also compared the proposed rates with the current base rates and noted several differences. AR 2391–93; 2407–08; 2417–19; 2427; 2435–36. The DCAA accepted the proposed direct labor rates of two subcontractors. AR 2418; 2427. One team member's proposed base year salaries were significantly lower than their current hourly labor rates. AR 2407. Those direct labor rates were accepted only after the DCAA confirmed that two employees had agreed to accept lower proposed hourly labor rates. AR 2407. Another team member's direct labor rates were accepted in large part, although the DCAA noted two significant discrepancies. AR 2435–36. With regard to one team member, the deficiencies noted were so serious that the DCAA felt it could not express an opinion on the direct labor rates used. AR 2392.

Based upon the DRI Cost Information Services recommendation of a proposed labor escalation rate of 3.4% for the first five years of contract performance, the DCAA did not take exception with JWK's proposed escalation rate of 1.5%. AR 2388. DCAA conducted a similar study of the JWK team members' proposed escalation rates and found that each subcontractor, with the exception

of one subcontractor for whom DCAA did not note the proposed escalation rate, had proposed an escalation rate of 1.7%. AR 2392; 2408; 2418; 2427; 2436. With regard to at least one subcontractor, the DCAA noted that the subcontractor appeared to have significantly underbid the labor escalation. AR 2408. However, the DCAA also stated that it could not recommend more costs than the subcontractor had bid and therefore took no exception to the subcontractor's proposed rate. *Id.* With regard to a second subcontractor, the DCAA noted that the escalation rate was based upon the recommendation of the prime contractor, based upon work performed at Cherry Point, North Carolina, and that it was "reasonable to expect that people would be hired to work from that area at the prevailing salary scale." AR 2393.

DCAA also analyzed the Indirect Labor Rates submitted by JWK and its team members including Overhead, General and Administrative Costs and Subcontractor costs. AR 2388; 2394–95; 2408–09; 2419–20; 2427–28; 2437. DCAA noted that it took no exception to the Indirect Labor Rates of three of JWK's team members. AR 2409; 2419; 2437. However, although not excepting the proposed rates, the DCAA noted that it took exception with the methodology employed by at least one of the team member's method of calculating the rate. AR 2437.

Based upon these comparisons, the SSEB conducted its cost realism analysis and upwardly adjusted JWK's proposed cost to reflect the changes made in the escalation rates for JWK and three members of the JWK team and the adjustment based upon discrepancies with the indirect labor rates proposed by three JWK team members. AR 2616. The Government Realized Position was determined to be $167,191,517.00.

As discussed above, prior to receiving contract proposals the government had developed an historical IGE of $164,206,050.00 for this contract. AR 2130. By comparing the Government Realized Position with the IGE, SSEB determined that JWK had submitted a cost proposal that was adequate for determining cost reasonableness and realism. AR 2130–31.

## C. The Discussions

On August 7, 2000, the SSAC met to review the documentation prepared and provided by the SSEB. AR 2105. At this time, the SSAC adopted the recommendations of the SSEB, found that both LTM and JWK were competitive, and recommended that they both be selected for the competitive range. AR 2107. The SSAC further recommended that the government enter into discussions with the two offerors in order to allow the offerors to revise their technical and management proposals. AR 2107. The SSAC indicated that by entering into discussions with the offerors, a satisfactory level of support services could ultimately be ensured. AR 2107.

On September 12, 2000, the Contracting Officer ("CO") sent discussion letters to both JWK and LTM. AR 441–45; 486–90. Both contractors were advised of Deficiencies, Specific Weaknesses and Weaknesses in the Technical, Management and Past Performance areas of their proposals. In particular, among other items, JWK was advised that their response to Task 3 in the Technical proposal was rated as a Deficiency because of "[n]on-compliance with ... [Solicitation] on key personnel." AR 443. With regard to the Management proposal, JWK was advised of seven specific Weaknesses with its Management Approach. AR 444. Specifically, it was noted that a problem existed in the area of "[r]oles of task order managers in product/process quality and how these functions are accommodated in the acquisition and overhead structures." *Id.* It was noted that this was considered a [W]eakness "because the proposal states that [Task Order Managers] ... will be directed [sic] billed for these apparent overhead functions. Additionally at least two of three PM [Project Manager] resumes submitted were senior corporate management and thus also provides[sic] for the potential for direct billing overhead activity." AR 444; 454. Among other items, JWK was advised that the SSEB interpreted a Weakness with regard to " 'Recruitment/Retention/workforce improvement procedures for attracting, retaining and upgrading skills of highly trained and motivated technical personnel' ... because the JWK Team did not adequately describe their recruitment procedures." *Id.* Four key personnel resumes were identified as not meeting or substantiating specific requirements of the Solicitation and those problems were specifically described. AR 444–45. Moreover, with regard to the proposal submitted under the Past Performance factor, the SSEB noted that it was unhappy with the negative questionnaire and CPARS responses received on behalf of JWK team member [* *]'s performance. AR 445. It was noted that no CPARS data had been received for JWK. Furthermore the SSEB stated that it had found "no managerial control systems/systemic improvements demonstrated benefits to the government." *Id.*

Similarly, LTM was advised that the SSEB had isolated various Significant Weaknesses, Weaknesses and Deficiencies in its Technical proposal, and the specific problems with Task responses were described. AR 488. In particular, the Significant Weaknesses and Deficiencies of the Task 2 response and the Deficiencies and Weaknesses of the Task 5 response were noted. AR 488. The LTM Management proposal was also discussed and three difficulties were noted with regard to LTM's management proposal. AR 489. Specifically, it was noted that a problem existed in the area of "Roles of task order managers in product/process quality and how these functions are accommodated in the acquisition and overhead structures." AR 489. It was specifically noted that "[t]he LTM Team does not adequately discuss how these functions are accommodated in overhead and the contract manager is identified as a key personnel PM [Project Manager] providing for the potential for direct billing in what is inherently an overhead function." AR 489. Six key personnel resumes were identified as not meeting or substantiating requirements of the Solicitation. *Id.* Furthermore, with regard to the Past Performance element of the proposal, it was noted that no CPARS data had been received for LTM and that the CPARS data received for other LTM team members ranged from "Marginal to Exceptional." AR 490. The discussion letter also pointed out that "[n]o Managerial control Systems/Systemic Im-

provements beneficial to the government were noted for ... LTM." *Id.*

Neither contractor was advised as to any Deficiency or Weakness in the Cost factor of their respective proposals. AR 445; 490.

Following the discussion letters, JWK and the government communicated numerous times by e-mail and a telephone conference call was conducted to answer some of JWK's questions about the Weaknesses, Specific Weaknesses and Deficiencies described in the September 12, 2000 correspondence. AR 446–473. Notably, the government clarified its September 12, 2000 correspondence and specifically identified the two individuals identified as the authors of Task 3 who were not identified as Key Personnel as required by the Solicitation. AR 457. Moreover, [**] provided a lengthy letter addressing the negative CPARS comments and negative questionnaire responses. AR 468–473. LTM apparently also communicated with the government via telephone and e-mail with similar concerns regarding its proposed discussion areas. AR 491. On September 28, 2000, both parties timely submitted their revised proposals to the Navy. AR 480; 492.

### D. Revised Proposals

#### 1. SSEB's Review of LTM's Revised Proposal

#### a. LTM's Revised Technical Proposal

In its review of the revised proposals, SSEB assessed the Technical factor of the LTM proposal, previously rated as Marginal, as having a Satisfactory rating, because the proposal "met the government's requirements and any weaknesses were considered acceptable." AR 2312. The SSEB found that LTM had submitted an "excellent approach to supportability analysis" for both Sample Task 2 and 5, and rated those responses as strengths. *Id.* LTM was also assessed as having demonstrated an adequate understanding and effective technical approaches in Tasks 1 and 4. However, the SSEB still assessed a Weakness in Task 3 because the LTM team emphasized development of a web based system and did not provide adequate detail on the identification and prioritization of Affordable Readiness Initiatives identified in the Task. *Id.* The LTM team's Technical proposal risk, previously rated as Medium, was assessed a rating of Low, and was determined to have little or no potential to cause disruption of schedule, increase in cost, or degradation of performance. AR 2314. The SSEB concluded that "normal contractor effort would probably be sufficient to overcome difficulties." *Id.*

#### b. LTM's Revised Management Proposal

The SSEB rated the Management Proposal submitted by LTM, previously rated as Satisfactory with Medium risk with an overall assessment of Highly Satisfactory with Low risk. AR 2319–20. The SSEB indicated that the more important of the two subfactors, Management Approach, previously rated as Satisfactory was rated as Highly Satisfactory and exceeded requirements of the Solicitation in a manner beneficial to the government because "their efficient approach to ensure quality and cost has the potential to reduce the cost of every task order." AR 2319. With regard to the lesser important subfactor, Key Personnel, the SSEB rated LTM's proposal, previously rated as Marginal, as Outstanding, and stated that all fifteen of the key personnel resumes submitted either met or exceeded the minimum requirements of their respective labor categories. AR 2320. The LTM team's proposal risk, previously rated as Medium, was assessed a rating of Low, because their approach had little or no potential to impact the quality and timeliness of the products and services delivered under the contract. *Id.* The SSEB further commented that "[t]he proposal contained a very high proportion of Satisfactory and Highly Satisfactory key personnel resumes which indicates that they should be able to respond effectively to technical challenges and workload fluctuations and should have no potential to impact contract performance." *Id.*

#### c. LTM's Revised Past Performance Proposal

The LTM proposal for Past Performance was essentially unchanged from the SSEB's prior assessment and was evaluated as bearing a Low Risk, based upon the positive comments and feedback from customers. AR 2298. The SSEB determined that one

LTM team member had cited one systemic improvement beneficial to the government, although the evaluation team had previously concluded that an LTM Team member had demonstrated two such beneficial systemic improvements. AR 2324. The SSEB noted that LTM still did not have any CPARS and that the CPARS for LTM team members ranged from "Marginal to Exceptional." AR 2324. The SSEB also noted that no quality awards had been submitted for LTM, although several LTM team members had submitted such awards. AR 2324–25. Based upon the offeror's performance history, questionnaires, CPARS, managerial control systems/systemic improvements record, and awards, the SSEB determined that there was "little doubt" that LTM would successfully perform the required effort. AR 2324.

### 2. SSEB's Review of JWK's Revised Proposal

### a. JWK's Revised Technical Proposal

In its review of JWK's revised Technical Proposal, the SSEB again assessed a rating of Marginal, because although the proposal "demonstrated a general understanding of the government's minimum requirement ... it contained weaknesses and minor deficiencies that could impact successful performance if accepted." AR 2308. The SSEB noted that responses to Task items 1,3 and 5 lacked sufficient detail and noted that the response to Task 3, in particular, was deficient because JWK had "included a task preparer in a key labor category that was not proposed as key personnel in the proposal." *Id.* The SSEB noted that it considered the responses to Tasks 2 and 4 to be strengths and the JWK team exceeded the government's stated requirements "because of their demonstrated knowledge of several important elements of a successful supportability analysis." AR 2309. However, the evaluation team determined that these strengths "were insufficient to overcome the weaknesses and the deficiency in the other tasks." AR 2308. The JWK Technical proposal risk was also evaluated, once again, as Medium because inconsistent plans and technical approaches and a lack of details in methods and processes could potentially cause schedule delays or inordinate coordination between the Government and the JWK team to clarify tasking. AR 2310.

### b. JWK's Revised Management Proposal

The JWK proposal for the Management factor, previously rated as Marginal with Medium risk, received an overall rating of Satisfactory with Low risk. AR 2317. The Management Approach subfactor, previously rated as Unsatisfactory, received a rating of Satisfactory and it was noted that any weaknesses now present were considered to be acceptable to the government. AR 2317. In the Key Personnel subfactor, previously rated as Marginal, JWK received a rating of Satisfactory and it was noted that only one of the key personnel resumes submitted was unsatisfactory because it did not meet the Government's minimum requirements. AR 2317. The JWK team's proposal risk, previously rated as Medium, was rated as Low, because their Management Approach had little or no potential to impact on the quality and timeliness of the products and services delivered in performance of the contract. AR 2318. Furthermore, the SSEB was of the opinion that the weaknesses of the one resume of which it did not approve, could easily be overcome by finding a replacement to meet the Government's requirements. *Id.*

### c. JWK's Revised Past Performance Proposal

The rating the SSEB assessed the revised JWK proposal for Past Performance was essentially unchanged from the prior evaluation and JWK was again assessed as having a Low Risk, based upon the comments and feedback from customers. AR 2322. The government once again noted that although the JWK team submitted items which it considered to be systemic improvements, the SSEB did not find that any of those items were beneficial to the Government. *Id.* Although the JWK team did not have any CPARS data, the SSEB specifically noted that JWK was of the opinion that the availability of CPARS data was "beyond JWK control," but that they had notified current government customers that they required such an evaluation. AR 2323. The SSEB noted that it had reviewed the explanation of [* *]'s poor performance evaluations and disagreed with [* *]'s representations. AR

2323. Nevertheless, the SSEB did not hold this disagreement against JWK in its assessment, but rather noted this information as a "comment." *Id.* In summary, the SSEB concluded that little doubt exist[ed] that the team will successfully perform the required effort. *Id.*

### E. Award Determination

The SSAC reviewed and adopted the findings of the SSEB. AR 2300. Based upon the overall finding of the SSEB, the SSAC recommended that the SSA award the contract to LTM. *Id.* Specifically, the SSAC noted that "LTM received the highest technical and management ratings of the two offerors with a low risk rating." *Id.* The SSAC also acknowledged that LTM's cost proposal was higher than that of JWK, but determined that the cost was justifiable due to the superiority of LTM's proposal. *Id.*

The SSAC noted that LTM's understanding of the Sample Tasks, Management Plan, and Past Performance were superior to that of JWK. *Id.* Additionally, the SSAC noted that LTM's proposal with respect to key personnel was far superior to that of JWK. AR 2300. Accordingly, the SSAC concluded that "the superior proposal by LTM ... clearly represents the best value to the Government and should deliver first rate service to our Fleet." *Id.*

Based upon this recommendation, the SSA independently determined that the LOT III award should be made to LTM on its revised proposal. AR 2301. The contract was so awarded on December 22, 2000. AR 2480.

### Procedural History

Five days after the contract was awarded, on December 27, 2000, JWK filed a size protest with the Small Business Administration ("SBA"). AR 2658–70. 15 U.S.C. § 637(b); 13 C.F.R. § 121.1001(a)(1); FAR 19.302. The crux of JWK's argument was that LTM was improperly affiliated with In-formation Spectrum, Inc. ("IS"), a company listed in its proposal as an LTM team member. Specifically, JWK averred that LTM was no more than a "front" for IS, which was not qualified to compete for LOT III because IS was not a small business. AR 2663–65. On January 19, 2001, SBA issued a ruling in which it determined that for the purposes of the LOT III procurement, LTM is a small business. AR 2685. In its decision, the SBA noted that other than the allegation of an inappropriate affiliation with IS, JWK did not raise any other argument that LTM was not a small business. AR 2681. JWK did not appeal the SBA decision.[5]

Contemporaneously in this Court, on January 16, 2001, plaintiff filed a Complaint accompanied by a Motion for a Preliminary Injunction and a Motion for a Protective Order. Plaintiff seeks a preliminary and permanent injunction ordering defendant to terminate the contract with LTM as well as a declaration that the award was contrary to law and that JWK is entitled to contract award as well as equitable relief. In the action before this Court, plaintiff did not repeat the allegations relative to the petition for a size determination before the SBA, but rather, alleged seven separate causes of action in support of its argument that the Navy's award to LTM should be set aside. Specifically plaintiff asserted that the Navy: (1) deviated from the evaluation scheme set forth in the solicitation and the Source Selection Plan; (2) improperly found LTM to be a responsible source; (3) failed to conduct meaningful discussions with JWK regarding the evaluated probable cost of JWK's proposal and failed to properly evaluate JWK's proposal under the Cost factor; (4) failed to properly evaluate JWK's proposal under the Management approach subfactor; and (5) failed to properly rate JWK's proposal under the Past Performance subfactor. In the sixth and seventh causes of action, JWK alleges that the Deputy Assistant Command-

---

5. Although the time for pursuing an appeal of the SBA decision has passed, counsel for JWK has indicated that he intends to petition the SBA to re-open the proceeding pursuant to 13 C.F.R. § 121.1009(h). On April 5, 2001, this Court issued an Order outlining the procedures which must be followed if JWK intends to release infor-mation currently subject to the Protective Order in place in this matter. Notwithstanding plaintiff's arguments to the contrary, this effort will likely not change the outcome of the award. *See Mid–West Constr. Ltd. v. United States*, 387 F.2d 957, 181 Ct.Cl. 774 (1967).

er for Logistics "is manipulating evaluations of competitive proposals for Navy aviation support services so that contracts for competency-based requirements are awarded to a single source, or to concerns that are controlled by this source through teaming agreements and other arrangements." In the sixth cause of action plaintiff asserts that defendant failed to issue a necessary declaration asserting that an award would be made to a single source and failed to issue a declaration asserting that an award would be made to a single source under LOTS IV and V. In the seventh cause of action plaintiff asserts that defendant acted with malice toward JWK, breaching the government's implied duties of good faith, fair dealing, and honest consideration.

On January 17, 2001, the Court issued an Order directing the parties to confer and attempt to reach an agreement upon a proposed schedule for further proceedings in this matter. The parties were directed to file a Status Report setting forth a schedule for filing the Administrative Record, and briefing in accordance with Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC"). On January 24, 2001, the parties each filed Status Reports.

Also on January 24, 2001, LTM moved to intervene pursuant to RCFC 24. That motion was granted by order dated January 26, 2001, in conjunction with the motion granting the protective order and establishing a briefing schedule in accordance with the parties' request that the provisions of RCFC 83.2 be waived.

On February 23, 2001, defendant moved for dismissal of Count VI of the Complaint pursuant to RCFC 12(b)(1) and opposed the Motion for a Preliminary Injunction. On that same day plaintiff filed a Motion for Summary Judgment upon the Administrative Record pursuant to RCFC 56.1. On March 9, 2001, defendant filed a Cross Motion for Summary Judgment upon the Administrative Record. Intervenor has not separately moved for judgment upon the administrative record but did participate in the briefing to the extent that LTM has filed a Memorandum in support of defendant's cross motion as well as in support of defendant's opposi-

tion and reply to plaintiff's motion for summary judgment. Oral argument was held on April 4, 2001.

## DISCUSSION

### Jurisdiction

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act 1996, Pub.L. No. 104–320 § 12, 110 Stat. 3870, 3874–75 (1996), this Court has jurisdiction "to render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1).

### Motion to Dismiss

The preliminary issue before the Court is defendant's Motion to Dismiss Count VI of the Complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. The first sentence of plaintiff's complaint concerns contracts to support the NAVAIR *3.1* Logistics Systems Integration Department. The contract awarded in this protest was awarded to support the NAVAIR *3.2* Maintenance Planning & Design Interface Department. The second sentence of the allegation stated in Count VI asserts that with regard to LOTS IV and V of the solicitation, the government failed to state that awards would be made to a single source. Defendant argues that this Court does not have jurisdiction over the allegations stated in Count VI because plaintiff is contesting awards for which it did not compete and therefore is not an "interested party" under the Tucker Act. Plaintiff did not oppose defendant's motion to dismiss and the intervenor did not participate in this motion.

### 1. Standard of Review

Without jurisdiction, this Court does not have authority to grant any relief. *See e.g., Brown v. United States*, 105 F.3d 621, 624 (Fed.Cir.1997) (upholding trial Court's dismissal of plaintiff's complaint for lack of jurisdiction). The issue in determining whether to dismiss a cause of action based upon this Court's lack of jurisdiction is not whether a plaintiff will ultimately prevail but "whether the claimant is entitled to offer evidence to

support the claim." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988). If it appears, upon construing the allegations in the complaint favorably to the pleader, that plaintiff can prove no set of facts which would entitle him to relief the complaint must be dismissed. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *CHE Consulting, Inc. v. United States,* 47 Fed.Cl. 331, 334 (2000) (citing *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)). Ultimately, the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence is on the plaintiff. *See Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds,* 846 F.2d at 748; *CHE,* 47 Fed.Cl. at 334.

### 2. Analysis

In order to pursue an action pursuant to 28 U.S.C. 1491(b)(1) plaintiff must be an "interested party." *Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 643 (2001); *Myers Investigative and Sec. Servs., Inc. v. United States,* 47 Fed.Cl. 605, 612 (2000). The lack of a clear definition of the term as it is used in the statute has caused the Court to look for guidance among other jurisdictional statutes which have interpreted the term. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333–34 (2001); *Cybertech,* 48 Fed.Cl. at 643–44; *CHE,* 47 Fed.Cl. at 335–40; *Myers,* 47 Fed. Cl. at 612; *American Fed'n of Gov't Employees, AFL–CIO v. United States,* 46 Fed.Cl. 586 (2000) ("*AFGE* ").

■ Under the most expansive of the standards employed, this Court has followed the requirements set forth for determining standing pursuant to the Administrative Procedures Act ("APA"). 5 U.S.C. § 702; *Cybertech,* 48 Fed.Cl. at 644; *AFGE,* 46 Fed.Cl.

at 595; *CHE,* 47 Fed.Cl. at 338–40 (applying APA standard, among others, to determine whether party was an interested party under 28 U.S.C. § 1491(b)(1)). Under this standard, in order for JWK to establish that it is an "interested party" under 28 U.S.C. § 1491(b)(1) it must demonstrate that (1) it suffered sufficient "injury-in-fact;" (2) the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision;" and (3) the interests sought to be protected are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Cybertech,* 48 Fed.Cl. at 644; *AFGE,* 46 Fed.Cl. at 595; *see also CHE,* 47 Fed.Cl. at 338.

■ Because this Court concludes that the injury alleged by JWK is neither "fairly traceable" to the Navy's decisions upon other contracts, nor within the "zone of interests" to be protected, the injury in fact element of this test is not addressed here. The second prong of the APA test requires plaintiff to demonstrate that the injury, the failure to obtain a contract on LOT III, is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision." *Cybertech,* 48 Fed.Cl. at 644; *AFGE,* 46 Fed. Cl. at 595. Moreover, the injury is not likely to be redressed by a favorable decision in this matter. The Court recognizes that the allegations in Count VI emanate from assertions contained in the size protest before the SBA. Those allegations, however, have not been pled in this action and counsel for plaintiff has assured the Court that those issues are not raised in this action. To the extent that JWK has argued before the SBA that LTM was an inappropriate "front" for a large company, Information Spectrum, Inc., the SBA has determined that JWK's allegations are without merit. Accordingly, in this case, the injury, *i.e.* the failure to obtain a contract on LOT III, is not fairly traceable to the government's decision to award other contracts.

Under the third prong of the APA test, JWK must establish that "the injury ... falls within the zone of interests sought to be protected by the statutory provision whose violation forms the basis for his complaint." *Cybertech,* 48 Fed.Cl. 638; *CHE,* 47 Fed.Cl.

at 339. JWK has not alleged that at anytime during the proposal period, it submitted offers responsive to a solicitation for contracts to support the NAVAIR 3.1 Logistics Systems Integration Department. Furthermore, it is undisputed that although both LOTS IV and V of the solicitation sought bids on an unrestricted basis, JWK did not at anytime during the proposal period, submit offers responsive to those LOTs. Moreover, plaintiff does not challenge those awards but only alleges that the government acted improperly by failing to advise offerors that it allegedly planned to award the contract to a single source. Even if JWK could establish that all five LOTS were awarded to a single source, and it does not appear from the record that JWK is correct in this assertion, it is impossible to discern from plaintiff's complaint, precisely which statute or regulation might have afforded protection to JWK.

At best, JWK is merely asserting a generalized interest in the government's duty to conduct itself in accordance with law in the procurement process. It is well established that persons who have only a generalized grievance about the way the government operates are not within the zone of interest to establish standing. *See AFGE*, 46 Fed.Cl. at 599; *cf. Cybertech*, 48 Fed.Cl. at 644 (determining that although plaintiff had not cited a specific statute, it was within the zone of interest because it had "cognizable interest in ensuring that plaintiff was not denied the opportunity to submit a quotation because of egregious governmental impropriety"). Since plaintiff has failed to establish it is within the zone of interest to be protected, JWK does not meet the third prong of the APA standard.

Accordingly, JWK is not an interested party for purposes of asserting the allegations stated in Count VI and that portion of the complaint must be dismissed for lack of subject matter jurisdiction. RCFC 12(b)(1).[6]

## Cross–Motions for Summary Judgment

### 1. Standard of Review

Motions for summary judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Cube Corp. v. United States*, 46 Fed.Cl. 368, 372 (2000). Under RCFC 56(c),[7] resolution of disputes pursuant to summary judgment is considered appropriate when "the pleadings, the depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996). A party may prevail upon a motion for summary judgment, and avoid trial, by demonstrating that no material facts exist which would change the outcome of the litigation under the substantive law governing the suit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Material facts are those which are relevant and necessary to the proceedings and could potentially affect the outcome of the dispute. *Id.*

In cases such as this one, in which both parties move for summary judgment, each party bears the burden of demonstrating the absence of material facts in its own case. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "It does not follow that if one motion is rejected, the other is necessarily supported." *Rosboro Lumber Co. v. United States*, 43

---

6. This conclusion is also supported under the more restrictive standards applicable in proceedings before the General Service Board of Contract Appeals. *Federal Data Corp. v. United States*, 911 F.2d 699, 704 (Fed.Cir.1990) (determining that contractor who did not submit proposal for solicitation did not have economic interest in procurement and could not be an "interested party"); *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 364–65 (Fed.Cir. 1989) (same).

7. RCFC 56 is patterned upon Rule 56 of the Federal Rules of Civil Procedure and is similar in both language and effect. Both rules state that summary judgment is appropriate in situations in which "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c)(1998); Fed.R.Civ.P. 56 (1998).

Fed.Cl. 606, 609 (1999) citing *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). Rather, the Court must evaluate each party's motion independent of the other, and resolve all reasonable inferences against the party whose motion is under consideration. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir. 1988) citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987).

 Under the standard of review applicable in bid protests, an agency's procurement decisions will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). The Court may not intervene unless the disappointed bidder demonstrates that there was no rational basis for the award decision, or demonstrates "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1332; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000).

 Under this standard, the Court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Cube Corp. v. United States*, 46 Fed.Cl. 368, 374 (2000). Rather, the Court's role is to review the agency's decision to determine if it was legally permissible, reasonable, and supported by the facts. *Cube*, 46 Fed.Cl. at 374. Moreover, in reviewing the award process, the Court must be mindful that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996); *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993) ("agencies are entrusted with a good deal of discretion in determining which bid is the most advantageous to the [g]overnment"). The deference accorded to the agency is further enhanced in situations, such as that before the Court in this instance, involving a negotiated procurement. *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir. 1995); *Mantech Telecomm. & Info. Sys.*

*Corp. v. United States*, 49 Fed.Cl. 57 (2001); *Burroughs Corp. v. United States*, 617 F.2d 590, 598, 223 Ct.Cl. 53 (1980).

### 2. Validity of Navy's LOT III Award Determination

#### a. Past Performance Proposal

In Count I of the complaint, plaintiff alleges that the agency violated 10 U.S.C. § 2305(a)(2); 10 U.S.C. § 2305(b)(1); FAR 15.101–2(b)(1) and FAR 15.308 because the government deviated from the evaluation scheme set forth in the Solicitation and in the Source Selection Plan ("SSP"). Specifically, plaintiff asserts that the agency improperly evaluated JWK's Past Performance volume as lacking CPARS data and as not demonstrating across the entire team, "managerial control systems/systemic improvements." In Count V plaintiff essentially repeats the allegations stated in Count I, but asserts additional violations of 41 U.S.C. § 405(j); FAR 15.101–1(c); FAR 15.304(c)(1); FAR 15.305(a)(2)(ii); FAR 15.306(d) and FAR 15.308. In addition to the same allegations stated in Count I of the complaint, JWK asserts that the agency failed to afford plaintiff meaningful discussions and an exchange upon the concerns that resulted in the stated observations regarding CPARS data and "managerial control systems/systemic improvements."

As a preliminary matter, the Court finds that it need not address the merits of plaintiff's allegations that the Navy violated FAR 15.101–2(b)(1) because that regulation does not apply to this procurement. That regulation applies only to evaluations utilizing the lowest price technically acceptable pricing method which was not applicable in this procurement. As expressly stated in the Source Selection Plan, award of the contract under each LOT resulting from this solicitation was to be made "to the Offeror whose proposal, conforming to the solicitation, offers the greatest value to the Government, cost and other factors considered, rather than to the proposal offering the lowest price." AR 45.

The majority of the statutes plaintiff asserts were violated by the Navy are those which specify items which must be included

in the solicitation and considered in the agency's evaluation. By statute, agencies must rate offerors' past performance. 41 U.S.C. § 405(j). Further, pursuant to the Competition in Contracting Act, the government is required to specify its needs and solicit proposals "in a manner designed to achieve full and open competition for the procurement." 10 U.S.C. § 2305(a)(1)(A)(i)(1994). To this end, a solicitation for competitive proposals "shall at a minimum include . . . (i) a statement of all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating . . . competitive proposals . . .; (ii) the relative importance assigned to each of those subfactors;" and (iii) a statement as to whether discussions with offerors will be conducted. 10 U.S.C. § 2305(a)(2). Agencies are statutorily required to evaluate proposals "based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1). The FAR provides further guidance for items which must be included in the solicitation documents. FAR 15.305(a)(2)(ii).[8] Moreover, in situations such as that before the Court, if the contract is awarded to other than the lowest priced proposal, "the perceived benefits of the higher priced proposal shall merit the additional cost." FAR 15.101-1(c).

In the Source Selection Plan for this solicitation, the Navy expressly set forth the criteria it established for evaluating the offerors' past performance. AR 47-48.

> Evaluation of past performance will be based on consideration of all relevant facts and circumstances. The evaluation will include demonstrated past performance in quality of product or service; cost control; schedule; business relationships; customer satisfaction; key personnel retention;

and compliance with subcontracting plan goals (if applicable)

> Information utilized will be obtained from the references listed in the proposal, other customers known to the Government, *CPARS (if available)*, and others who may have useful and relevant information. Information will also be considered regarding any significant subcontractor (proposing cost of $1,000,000.00 or more) and key personnel records.
>
> *In the case of an Offeror, or proposed employees of the Offeror, that do not have past contract performance information or with respect to which information on past contract performance is not available, the Offeror will not be evaluated favorably or unfavorably on the factor of past performance.*

AR 47-48 (emphasis added).

The portion of the solicitation describing proposal content requirements, directed each member of the offeror's team proposing costs in excess of $1,000,000.00 to submit a list of up to seven contracts currently ongoing or completed within the last three years. AR 150. Offerors were advised that in addition to questionnaires, to be completed by team members' customers, for purposes of evaluating Offerors' past performance, the government "reserve[d] the right to use past performance information obtained from sources other than those identified by the Offeror." AR 150. The Solicitation further advised Offerors that with regard to each relevant contract to be reviewed for past performance, they were to "[b]riefly describe . . . any managerial control systems or systemic improvements currently in place to resolve problems." AR 151.[9]

---

8. FAR 15.305(a)(2)(ii) provides in relevant part: The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or current contracts . . . for efforts similar to the government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance.

> The source selection authority shall determine the relevance of similar past performance information. 48 C.F.R. § 15.305(a)(2)(ii).

9. Other items requested under the solicitation included evidence of quality awards or certifications demonstrating that the offeror possessed a high quality process for performing the services required; information on problems encountered during performance of contracts detailed in this section and corrective actions taken to solve these problems; and, if applicable, evidence of compliance with subcontracting goals. AR 150-51.

### i. Rationality of Including CPARS Data in Evaluation

By requiring that subcontractors with costs in excess of $1,000,000.00 fulfill the same requirements under the solicitation as the prime contractor, the record reflects that for purposes of award, the Navy intended to evaluate all offerors upon past performance as a team, consisting of a prime contractor and several subcontractors. AR 150. The JWK team included five subcontractors: [* *], [* *], [* *], [* *] and [* *].

In its initial review of the JWK team past performance proposal, the SSEB evaluated the CPARS received for two of the six team members. AR 2126. The SSEB further noted that CPARS were not available for JWK, [* *] and [* *]. *Id.* It was specifically noted that one subcontractor, [* *], had received a number of negative CPARS. AR 2127. Although the agency evaluators commented upon the negative review of [* *]'s performance on other contracts, the SSEB did not state that the unavailability of other CPARS had either a favorable or unfavorable effect upon its evaluation of past performance. AR 2126–27. The SSEB merely stated that these items were unavailable for review. *Id.* There is no basis in the administrative record for finding that the government deviated from the solicitation requirements in its initial review.

■ If either offeror's past performance proposal did not conform to the Navy's interpretation of the Solicitation, the Navy could conduct further discussions with the offeror to allow it to correct its proposal. 10 U.S.C. § 2305(b)(4)(A)(i); FAR 15.306(d). Agencies are generally required to conduct discussions with all responsible offerors who submit proposals within the competitive range. FAR 15.306(d). These discussions "are intended to maximize the government's ability to obtain the 'best value' in a contract award based on the requirements and the evaluation factors set forth in the solicitation." *Mantech Telecomm. & Info. Sys. Corp.*, 49 Fed.Cl. 57 (2001) (citing *Dynacs Eng'g Co. v. United States*, 48 Fed.Cl. at 130); FAR 15.306(d)(2). To this end, the Navy has broad discretion in conducting discussions.

*Advanced Data Concepts*, 43 Fed.Cl. at 422; *Burroughs Corp.*, 617 F.2d at 598.

Section 15.306(d)(3) of the FAR provides: The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for an award, *significant weaknesses, deficiencies, and other aspects of its proposal* (such as cost, price, technical approach, past performance, and terms and conditions) *that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.*

§ 48 C.F.R. 15.306(d)(3) (emphasis added).

■ In the September 12, 2000 letter detailing the points for discussion, JWK was advised that there was "one Unsatisfactory CPARS provided by one customer regarding [* *][sic] performance." AR 445. Although the SSEB did not so state, this definition would have reasonably merited classification of this item as a deficiency. FAR 15.301(defining "deficiency"); AR 54 (defining term "unsatisfactory"). JWK was also advised that there had been "[n]o CPARS data received for ... JWK." AR 445. This was clearly an item which "could ... be altered or explained to enhance materially the proposal's potential for award." FAR 15.306(d)(3).

The record shows that the Navy gave JWK the opportunity to address the negative CPARS data and missing data in its September 12, 2000 discussion letter. AR 445. The negative CPARS review and the missing CPARS data were further discussed in subsequent e-mail correspondence and during the conference call on September 15, 2000. AR 451; 454–55; 457–58. There is no evidence in the record to support JWK's assertion that the Navy failed to afford JWK meaningful discussions and an exchange upon these issues pursuant to FAR 15.306(d). By advising the offeror that certain CPARS data was missing, the CO properly advised JWK of an aspect of its proposal that could be altered to enhance materially the proposal's potential for award. FAR 15.306(d). Clearly, the addition of positive CPARS could materially enhance JWK's proposal (likewise, additional negative CPARS might detract from the proposal) however, the ab-

sence of such material could not be considered either favorably or unfavorably under the solicitation and the CO did not comment further upon the absence of that data.

With regard to the missing CPARS data, the SSEB noted in its review of JWK's revised proposal that the offeror had apparently contacted current government customers but that JWK considered the submission of CPARS to be beyond its control because "CPARS is a government owned and operated system which no contractor may add or load data [sic]." AR 2323. Based in part upon the review of CPARS data received for other team members, the SSEB concluded that JWK's proposal presented a Low Past Performance risk with "little doubt" that JWK would perform successfully. AR 2323. Notwithstanding JWK's allegations, plaintiff has not provided any evidence to suggest that the Navy utilized the unavailability of CPARS data as a means for assessing JWK either a favorable or unfavorable rating. Rather, the government indicated that it was made aware that JWK did not have control over whether CPARS data was submitted.

Although not explained in the complaint or in the briefs, at oral argument counsel for JWK argued unpersuasively that pursuant to FAR 15.308, the source selection authority has a duty to base the award decision upon "a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. JWK's argument is apparently that the SSA could not rely upon the CPARS data if it was neutral. In the absence of evidence that the SSA did rely upon the absence of CPARS data this argument is without merit. Rather than showing that missing CPARS data payed a role in the decision, the evidence shows that the SSA distinguished the two past performance proposals and justified acceptance of the higher priced proposal in part because "LTM's proposal with respect to key personnel was far superior to that of JWK." AR 2300; FAR 15.101–1(c).

Based upon the administrative record, the Navy did not violate the statutes and regulations cited by JWK in the complaint. The SSP and the Solicitation clearly stated the factors to be considered and lucidly established that JWK's lack of CPARS data was neither a favorable or unfavorable factor in its decision, but merely a fact of the proposal. The administrative record clearly shows that the agency regarded the missing data as a neutral item in its evaluation. Furthermore, the Court finds no merit in plaintiff's allegation that the agency's decision was arbitrary, capricious or irrational. Moreover, based upon the review of the administrative record there is no evidence that JWK was in any way prejudiced by the agency's review of the past performance factor.

### ii. Rationality of Managerial Control Systems/Systemic Improvements Evaluation

In its review of the initial proposals, the SSEB also noted that the JWK proposal was responsive to the request in the Solicitation for evidence of managerial control systems and systemic improvements in that it included evidence of "efforts [the JWK team] considered to be systemic improvements," but that "these 'improvements' were determined to be either tasks on existing contracts or internal corrections." AR 2126. Accordingly, the SSEB concluded that "none of the six [t]eam members demonstrated systemic improvements that are beneficial to the [g]overnment." *Id.* It is considered that the government's determination would have been rational had the agency expressly stated that this was a weakness. FAR 15.301.

Accordingly, the administrative record shows that the Navy gave JWK the opportunity to address the issue in its September 12, 2000 discussion letter. AR 445. That correspondence listed the items addressed in straightforward bullet points, one of which expressly stated "[n]o managerial control systems/systemic improvements demonstrated benefits to the government." AR 445.

In its review of the revised proposal, the SSEB noted the same criticism that the JWK team cited "efforts they considered to be systemic improvements," but that "these 'improvements' were determined to be either tasks on existing contracts or internal corrections." AR 2322. The Navy clearly noted that the JWK team was responsive to the solicitation requirement, but the government

simply did not agree that plaintiff's proposed systemic improvements were as beneficial as JWK team members apparently thought. AR 2322–23.

■■■■ At best, plaintiff is arguing that it disagreed with the government evaluation of the Past Performance component of its proposal. "However, an offeror's disagreement with the agency does not render the evaluation unreasonable." *CVB Co.*, B–278478.4, 98–2 CPD ¶ 109 (Comp.Gen. Sept. 28, 1998); *McDonnell Douglas Corp.*, B–259694.2, B–259694.3, 95–2 CPD ¶ 51 (Comp. Gen. June 16, 1995). The Court finds no violation of the cited provisions of law and regulation. Further, plaintiff's argument that the agency's decision was arbitrary, capricious or irrational has no merit. Rather, the administrative record contains ample support that the agency reviewed the proposal but did not agree with JWK's characterization of perceived benefits. It is concluded that after discussions in which the weakness was specifically elucidated, the SSEB's rationally concluded that JWK was afforded a Low Past Performance risk under the evaluation factors set forth in the Solicitation and the SSP. Moreover, based upon the record the Court can find no indication that JWK was prejudiced.

### iii. JWK's Assertions of Deficiencies in LTM's Past Performance Proposal

In its motion for Summary Judgment plaintiff alleges for the first time that the contract award to LTM should be set aside because the Navy allegedly evaluated the solicitation requirements improperly by allowing LTM to demonstrate performance of contracts that were not of a similar type of work, similar in size and complexity. Pl. Br. 37. It is considered that the issue was not timely introduced into this litigation. As defendant and the intervenor correctly assert, the appropriate means to raise new issues would have been through a motion to amend the complaint pursuant to RCFC 15. The Court is not inclined, *sua sponte,* to permit the introduction of new allegations in the manner suggested and therefore the issue is not addressed in this decision.[10]

### b. Cost Proposal

In Count III of the complaint, JWK alleges that the agency violated 10 U.S.C. § 2305(a)(2); FAR 15.101–1(c), FAR 15.304(c)(1), FAR 15.306(d) and FAR 15.308 because the Navy failed to conduct meaningful discussions related to the cost realism adjustment of JWK's estimated probable cost proposal. Compl. ¶ 38. JWK further asserts that this failure by the Navy was arbitrary, capricious and not in accordance with law. Compl. ¶ 55.

It is undisputed that price or cost is a factor which must be evaluated in every source selection. 10 U.S.C. § 2305(a)(3)(A)(ii); 41 U.S.C. § 253a(c)(1)(B); FAR 15.304(c)(1). In compliance with these statutes as well as 10 U.S.C. § 2305(a)(2), in this Solicitation and SSP, cost was specifically described as one of four factors and was expressly ranked as the least important. AR 48; 289. Moreover, the SSP stated specifically that a cost realism analysis would be performed to "determin[e] the most probable cost to the [g]overnment." AR 48.

10. However, if JWK had timely raised the issue, the record evidence would not support the claim. Plaintiff focuses upon its assertion that the solicitation required that each Offeror demonstrate performance of contracts that are of a similar type of work, similar in size and complexity. Pl. Br. 37; AR 47. JWK asserts that the Navy's decision to award the contract must be set aside because LTM's Past Performance proposal failed to comply with this term of the solicitation. Pl. Br. 37.

As stated above, it is considered that the Solicitation clearly contemplated an evaluation of each offeror as a team composed of the Prime contractor and its proposed subcontractors' in the evaluation of the offerors' past performance. AR 150. The parties agree that cost of prior contracts was not the sole factor for determining whether the offeror had sufficient experience to adequately perform this contract. Pl. Br. 36–37. The administrative record clearly show that each of LTM's proposed subcontractors identified past contracts in which they had work that was similar in size and complexity to this contract. AR 1940; 1942; 1946; 1948; 1952; 1955; 1957; 1961; 1963. Accordingly, the Navy's conclusion that LTM, through its team, had demonstrated contracts of similar type of work, similar in size and complexity, was reasonable and is supported by the administrative record.

In the first instance, JWK contends that the Navy's probable cost realism analysis was flawed. As part of its evaluation of cost reimbursement contracts, an agency is required to conduct a cost realism analysis to determine what the probable cost of performance will be for each offeror. *Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 597–98 (1997) (determining probable cost evaluation is necessary "inasmuch as bidder's estimate may not be a valid indication of actual costs"), *appeal dismissed,* 132 F.3d 49, 1997 WL 687874 (Fed.Cir.1997). The applicable regulation provides in relevant part:

(i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.

(ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

§ 48 C.F.R. 15.404–1(d)(2)(i), (ii).

In order to overturn a cost realism decision plaintiff must demonstrate that the choice made by the agency was irrational. *CTA Inc. v. United States,* 44 Fed.Cl. 684, 693 (1999) ("Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis"). Moreover, in order to be rational it is not necessary to demonstrate that the cost realism analysis was performed with "impeccable rigor." *OMV Medical, Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000). Rather, the analysis must reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations. *Id.*

As foretold in the SSP, prior to receiving contract proposals, the government had developed an historical IGE and determined the probable cost to the government for this contract would be $164,206,050.00. JWK's proposed cost was $154,703,560.00 and LTM's proposed cost was $168,972,835.00. The Navy requested the advice of its experts, the DCAA, to assist in evaluating the offeror's proposals. FAR 15.404–1(a)(5). The administrative record contains contemporaneous documentation of the DCAA's analysis of the Labor Rates, Escalation Rates and Indirect Costs which led to the offeror's calculation of proposed cost. AR 2387–2474.

Specifically with regard to Escalation Rates, the DCAA compared the offeror's proposals with the escalation rate of 3.4% projected by the DRI Cost Information Service. As plaintiff correctly states, the DCAA did not take exception to either JWK's proposed escalation rate of 1.5% or to the escalation rate of 1.7% proposed by each of JWK's subcontractors. AR 2392; 2408; 2418; 2427; 2436. However, the administrative record contains evidence that this low rate was not accepted without reservation. DCAA noted that this rate was specifically recommended in the review of the subcontractors' proposed rates that "the escalation rate is based upon the recommendation of the prime for work being performed at Cherry Point, North Carolina. JWK is located in North Carolina, has been an incumbent for several years on this work, and it is reasonable to expect that people would be hired to work from that area at the prevailing salary scale for that area." AR 2392. However, the DCAA noted that it did not take exception to the 1.7% rate because the DCAA "cannot recommend more costs than the subcontractor has bid." AR 2408. Nevertheless, the DCAA noted that an escalation rate of 1.7% was indicative that the subcontractor "ha[d] significantly underbid the labor escalation." AR 2408. Based upon the opinion of its expert, DCAA, there appeared to be a deviation from the projected escalation rate and evidence of a possible underbid, the agency acted reasonably by upwardly adjusting the escalation rate to more closely reflect the actual costs the government could expect to pay over the life of the LOT III contract.

In evaluating the proposals the DCAA accepted LTM's cost escalation proposal of 3.0% but took exception to a proposed cost escalation of 3.5%, submitted by one of LTM's subcontractors. Given the agency's

requirements that it assess a probable cost, it was not irrational for the agency to reject an escalation rate that its expert, the DCAA, considered too low or too high. Notwithstanding plaintiff's assertions to the contrary, it was not irrational, based upon the DCAA's opinion that cost escalation in Cherry Point, North Carolina could be expected to conform to "the prevailing salary scale for that area," for the agency to assess a cost escalation rate that was somewhat lower than the 3.4% for the first five years of contract performance recommended by the DRI Cost Information Service. AR 2388.

The administrative record does not support plaintiff's assertion that the government improperly accepted LTM's proposed escalation rate and applied it against JWK. Nevertheless, even if the government did raise JWK's escalation rate to 3%, the cost realism analysis would not be flawed because the determination of proposed cost escalation rate is necessarily an exercise in approximation. Absent evidence of irrational assumptions or critical miscalculations, which we do not find in this calculation, the cost realism analysis is rational. *OMV Medical,* 219 F.3d at 1344.

Plaintiff alleges that the cost realism adjustment was both irrational and prejudicial because it eliminated the cost advantage of JWK's proposal by upwardly adjusting JWK's escalation rate. JWK relies upon a recent decision in this regard, apparently for the proposition that rather than upwardly adjust the escalation rate, the SSEB should have acknowledged each offeror's "unique approach." *CRAssociates, Inc.,* B–282075.2, 2000 CPD ¶ 63 (Comp.Gen. March 15, 2000). However, the facts in *CRAssociates* are completely different than those before the Court. In *CRAssociates,* it was specifically noted that the cost analyst had failed to consider certain costs applicable to both offerors. There is no similar allegation asserted in this case. To the contrary, the cost escalation rate was apparently adjusted to ensure that a similar rate, approximating that recommended by the DRI Cost Information Service was applied to both offerors.

The administrative record indicates that the agency determined that it could account for an increased escalation rate and the increased indirect costs by adjusting JWK's proposal cost to a "Government Realized Position" of $167,191,517.00. Notwithstanding this adjustment, JWK's cost proposal still reflected a lower cost than the similarly adjusted cost proposal submitted by LTM which was adjusted to a "Government Realized Position" of $169,972,835.00. Accordingly, the agency did not completely eliminate the cost advantage. Application of the adjusted escalation rate to JWK's proposed direct labor rates, which the government did not adjust, preserved JWK's unique approach of paying lower salaries, as reflected in the direct costs, and resulted in an overall proposal cost lower than LTM's. Furthermore, even if the agency did assess the same 3% cost evaluation rate against all offerors, plaintiff has not demonstrated that it would be unreasonable for the government to apply the same rate for the same anticipated work in the same locale. In light of the evidence presented there was no prejudice to plaintiff caused by adjusting the cost escalation rate. It is concluded that the cost realism analysis was not irrational, arbitrary capricious or in violation of law.

The second prong of JWK's argument is that the Navy failed to conduct meaningful discussions with regard to JWK's cost proposal.

■■■ As discussed above, it is well established that agencies are generally required to conduct discussions with all responsible offerors who submit proposals within the competitive range. 48 C.F.R. § 15.306(d); *Mantech Telecomm. & Info. Sys., Corp.,* 49 Fed.Cl. 57 (2001); *Dynacs Eng'g Co.,* 48 Fed.Cl. at 130. Discussions fail to be meaningful if the offeror is not advised of defects in its proposal which do not meet the requirements of the solicitation. *Dynacs,* 48 Fed.Cl. at 131; *See CRAssociates, Inc.,* B–282075.2, 2000 CPD ¶ 63 (Comp.Gen. Mar. 15, 2000).

■■■ That said, there is no requirement that all areas of a proposal which could have a competitive impact be addressed in discussions. The procuring agency does not have to identify every item that might improve an offeror's proposal. *Dynacs,* 48 Fed.Cl. at

131; *Cube,* 46 Fed.Cl. at 384; *ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 295–96 (1999); *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 835 (1999) ("[A]gencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal"). Rather, discussions must only address "areas of weakness." *SDS Intn'l v. United States,* 48 Fed.Cl. 759 (2001); *Dynacs,* 48 Fed.Cl. at 131.

 Based upon the cost realism analysis and its comparisons of the proposed amounts and the Government Realized Position against the IGE, the SSEB determined that the JWK cost proposal was acceptable. AR 2130–31. Plaintiff's assertion, that by virtue of the fact that the agency addressed the cost escalation rate in its cost realism analysis it should have conducted discussions, ignores the point that the Navy had determined that JWK's cost proposal was acceptable. Plaintiff's argument lacks merit given the fact that JWK's cost proposal was acceptable. The administrative record does not indicate that either the cost evaluation element of the proposal was, as contemplated by the FAR, a weakness or flaw that appreciably increased the risk of unsuccessful contract performance. FAR 15.301. Pursuant to the FAR, the procuring agency has broad discretion to conduct negotiations that will obtain the best value for the government. FAR 15.306(d)(3). There is no evidence in the administrative record to suggest that the evaluators gave JWK a score of "acceptable" but held serious concerns about JWK's cost proposal. Based upon the well settled law, the Court cannot find that the Navy acted irrationally when it did not address the cost realism adjustments to JWK's proposal in discussions.

Plaintiff argues that if it had had the opportunity to participate in discussions upon its cost proposal, it would have proposed a cap on expenses. As plaintiff points out, if a cost cap had been expressed in the proposal and the agency failed to conduct discussions, there might have been grounds for a deter-mination that the Navy failed to conduct meaningful discussions. *See, e.g. Serv–Air, Inc.; Kay and Assoc. Inc.,* B–258342, B–258243.2, B–258243.3, 96–1 CPD ¶ 267 (Comp.Gen. Dec. 28, 1994). However, those facts are not present in this case. Offerors for this Solicitation were explicitly advised that "if a corporate policy has been made to absorb a portion of the estimated cost, that should be stated in the proposal." AR 157. Moreover, there was no guarantee that the Navy would engage in discussions. The Solicitation expressly stated that "the Government may award a contract under each LOT on the basis of initial offers received *without discussions.*" AR 289 (emphasis added). It is clear that the government sought initial proposals which "contain[ed] the Offeror's best terms from a cost or price and technical standpoint." *Id.* If JWK intended to include a cost cap in its proposal it should have been included in the initial proposal. It is considered that there is *no* evidence in the administrative record to suggest that, based upon the proposal submitted, the Navy could have divined JWK's willingness to cap its costs.

It is obvious that JWK perceives cost advantages in its proposal which it asserts the agency did not recognize.[11] The SSA did acknowledge that LTM's cost proposal was higher than that of JWK, but ultimately determined that the cost was justifiable due to the superiority of the proposal. AR 2300. Based on the record JWK has not shown any violation of statute based upon the SSA's ultimate determination that the cost differential, to be incurred over ten years, is minimal considering the superiority of LTM's proposal. AR 2300.

Moreover, the agency's actions in conducting discussions with JWK were not arbitrary, capricious or an abuse of discretion. The Court finds no indication in the administrative record that JWK was prejudiced in any way by this determination.

**c. Management Proposal**

In Count IV of the Complaint, plaintiff alleges that the government violated 10

---

11. Specifically, plaintiff complains that the agency failed to acknowledge that JWK had negotiated with two key personnel and convinced them *to accept* lower salaries. The DCAA noted in its evaluation that it had confirmed the truth of this assertion. AR 2408. Accordingly there is no factual basis for plaintiff's assertion.

U.S.C. § 2305(a)(1)(A); 10 U.S.C. § 2305(b)(1); 10 U.S.C. § 2305(b)(4)(C); FAR 15.303(b)(4) and FAR 15.305(a) because the agency failed to properly evaluate the Management Approach subfactor of JWK's Management proposal.

Specifically, in the Complaint JWK alleges that the agency failed to note (1) JWK team's high employee retention rate; (2) JWK's formalized structured task order planning and execution plans; (3) weekly project status meeting; (4) monthly status reporting; (5) daily contact; and (6) process action teams to review and update processes, procedures and products. Based upon plaintiff's motion for summary judgment and plaintiff's reply to defendant's motion for summary judgment, JWK has apparently abandoned these arguments since the allegations raised in the complaint are not addressed by plaintiff in the briefs. The Court has nevertheless examined each of these allegations and finds them to be without support.

The SSP specifically stated that the Management Approach subfactor would be evaluated upon a demonstration of sound business practices in response to ... the requirements [of the solicitation] ... [including:] (1) Overall Management Approach ...; (2) Usage of Teaming, Personnel and subcontractors; (3) Recruitment/Retention; (4) Quality Management; (5) Cost Savings; and (6) Electronic Capabilities. AR 46. In its final evaluation of JWK's revised proposal the SSEB specifically found that the proposal met the minimum requirements in all areas except that it identified a weakness "because JWK did not substantiate their approach to advancing state of the art logistics." AR 2317. The Court cannot conclude, based upon the administrative record that the Navy failed to consider each of the elements raised in plaintiff's complaint. Each of the items alleged were subsumed within the evaluation factors which the SSEB considered and declared met the minimum requirements.

JWK's assertion that the government failed to treat JWK and LTM equally is also unfounded. JWK claims that both offerors were assessed a weakness in the initial proposal because each had bid overhead personnel as key personnel, which the agency con-

sidered to provide the potential for direct billing of some overhead items. AR 2123; 2122. The administrative record clearly shows that the agency considered this item resolved by both LTM and JWK upon review of the final proposals. AR 2375; 2378. Plaintiff has not demonstrated evidence to the contrary. Accordingly, the agency's actions in conducting discussions with JWK were not arbitrary, capricious, an abuse of discretion or violative of any law. The Court finds no indication in the administrative record that JWK was prejudiced in any way by this determination.

### d. Technical Proposal

JWK also argues that the Navy's evaluations of the task items in the Technical proposal were arbitrary and capricious. Specifically, JWK focuses upon the responses to Task 3. Plaintiff's first argument is that LTM's proposal failed to comply with the page limitations established in the Solicitation and apparently argues that those items should have been disregarded.

The Solicitation stated that offerors were to limit their responses to fifteen pages but could add up to *five* attachment pages to respond to Task 3, and explicitly stated that 11 × 17 "fold-out" pages could be used for diagrams, charts or graphic material. AR 141 (emphasis added). The solicitation required that excess text be removed and not evaluated. *Id.* Specifically, plaintiff asserts that in response to Task 3, LTM included *six* attachment pages of text and one page of graphic material.

The Court has examined LTM's response and finds no irregularity. Moreover, even if the response to Task 3 were irregular, the solicitation incorporated by reference FAR 52.215(f)(3) which expressly states that the "Government may waive informalities and minor irregularities in proposals received." AR 266.

Furthermore, in assessing Task 3 plaintiff alleges that defendant's evaluation of JWK's response was capricious. Specifically, JWK argues that "[u]nder the solicitation, only authors of Sample Task responses occupying a position in the Key Personnel labor catego-

ry must be proposed; 2 of the 5 authors of JWK's response to Task 3 are employed as an 'Engineer A,' and a 'Senior Engineer B' and neither is a Key Personnel labor category." Pl. Br. 38. In SSEB's initial review of JWK's proposal, it noted that "[t]he JWK team was deficient as they did not comply with the ... [Solicitation] requirement that individuals who prepared the task response in a key labor category must be proposed as key personnel in the Management Volume." AR 2119. This deficiency was raised during the discussions and JWK was expressly advised as to the names of the persons who did not comply. AR 454–55; 457; 2617. JWK responded by changing the titles these individuals hold. However, the government ultimately determined that by virtue of their job descriptions, the two individuals remained key personnel, regardless of the titles assigned by JWK. AR 2617. Accordingly, the SSEB, in reviewing the revised proposal, rated JWK as deficient in this category. AR 2309; FAR 15.301. It is considered that no rationale exists for plaintiff's conclusory allegation that the SSEB's determination was capricious. Moreover, the failure to comply with the Solicitation was a topic of discussions and JWK was given several opportunities to correct the deficiency. AR 454–55; 457; 2617. The administrative record contains considerable evidence that JWK failed to address this concern and the SSEB's rationally concluded that a deficiency marred JWK's response to Task 3. FAR 15.301.

### e. Bad Faith

JWK alleges in Count VII of the Complaint that the Navy acted in bad faith and exhibited malice toward JWK by awarding the LOT III contract to LTM.

It is well established that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g., Spezzaferro v. Federal Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir. 1986); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301–02, 211 Ct.Cl. 192 (1976). "[I]t requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith fair dealing." *Kalvar*, 543 F.2d at 1301–02. In other words, plaintiff must demonstrate "some specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302; *Asco–Falcon*, 32 Fed.Cl. at 604 ("plaintiff must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government") (emphasis in original); *see e.g., Libertatia Assoc., Inc. v. United States*, 46 Fed.Cl. 702, 711 (2000) (finding agency official acted with ill will toward plaintiff and manifested specific intent to injure).

Plaintiff has not alleged and the Court cannot find evidence in the record to support any of the allegations that defendant had a "specific intent to injure" plaintiff. Therefore, the Court finds that plaintiff failed to establish the Navy acted in bad faith.

### f. Classification of LTM as a Responsible Contractor

In Count II of the complaint plaintiff alleges that LTM was not a responsible contractor. Based upon plaintiff's motion for summary judgment and plaintiff's reply to defendant's motion for summary judgment, JWK has apparently abandoned these arguments since the allegations raised in the complaint are not addressed by plaintiff in the briefs.

Notwithstanding the government's argument to the contrary, in the absence of bad faith, the responsibility determination of the CO is not automatically immune from judicial review. *Impresa*, 238 F.3d at 1333. Nevertheless, it is well established that review of an agency's responsibility determination is appropriate if there has been a violation of a statute or regulation, or alternatively, if the agency determination lacked a rational basis. *Id.* No such situation is present in this case. Accordingly, on this record the government's responsibility determination was not arbitrary and capricious. The determination of responsibility appears instead to be consistent with the information developed in the procurement process.

### Motion for a Preliminary Injunction

Based upon the finding that plaintiff's claims of prejudicial errors in the procurement process are not supported by the administrative record, the Court does not ad-

dress plaintiff's request for injunctive relief. Plaintiff's Motion for a Preliminary Injunction is Denied as moot.

### CONCLUSION

(1) Defendant's Motion to Dismiss Count VI of the Complaint for lack of standing is **GRANTED;**

(2) Defendant's Motion for Judgment upon the Administrative Record is **GRANTED;**

(3) Plaintiff's Motion for Judgment upon the Administrative Record is **DENIED;**

(4) Plaintiff's Motion for a Preliminary Injunction is **DENIED;**

(5) The Clerk of the Court is directed to award final judgment dismissing the Complaint in this matter;

(6) On or before April 30, 2001, counsel for each party shall file with the Clerk's Office a redacted copy of this Order, with any material deemed proprietary marked out in brackets, so that a copy of the Order can then be prepared and made available in the public record of this matter;

(7) No costs.